**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Sep 30 2014, 8:37 am

Kevin S. Smith

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**STEPHEN T. OWENS**
Public Defender of Indiana

**VICKIE YASER**
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ANESSA B. BENNETT | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 20A05-1307-PC-339 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
Cause No. 20C01-0904-PC-9

**September 30, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Anessa B. Bennett appeals the post-conviction court's denial of her petition for post-conviction relief. Bennett raises five issues which we revise and restate as:

I. Whether her trial counsel and appellate counsel was ineffective; and

II. Whether the State withheld evidence from the defense in violation of Brady v. Maryland.[1]

We affirm.

## FACTS AND PROCEDURAL HISTORY

The relevant facts as discussed in Bennett's direct appeal follow:

On December 13, 2004, Officer Jose Miller of the Goshen Police Department (Officer Miller) conducted a controlled buy for methamphetamine between a confidential informant and Joseph Brown (Brown) at a residence in Glenwood Avenue in Goshen. After the deal was completed, Officer Miller field-tested the substance Brown had delivered and confirmed it was methamphetamine, weighing approximately 8.5 grams. In researching the information on the residence to get the search warrant for the home, it was determined that the residence belonged to Bennett and her husband, Raymond Bennett (Raymond) (collectively, the Bennetts).

The search warrant was executed the next day. Inside the residence, the Officers found five individuals: Brown, his girlfriend, and Bennett's three minor children. The Bennetts were not at home at the time of the execution of the search warrant; they were on a cruise that began on December 12 and had left the evening of December 10 for Michigan to await their flight to Florida. Brown, a friend of Bennett's, was asked to care for her children while they were on the cruise.

During their search of the garage's attic, the Officers found a surveillance camera directed at the driveway and connected to a television in the garage. The Bennetts' bedroom door was locked. After gaining entrance to the master bedroom, the Officers found a large clear plastic baggy containing a large amount of a powdery substance underneath the bed. On a stand, they found pieces of paper with names and numbers written on them. Underneath the papers, they noticed a clear plastic bag, containing a white powdery substance, later identified as

---

[1] 373 U.S. 83, 83 S. Ct. 1194 (1963).

2

methamphetamine, weighing 1.72 grams. Also, a wicker basket standing on a shelf on the same stand contained either a white powdery substance or a white powdery residue. In a drawer underneath the shelf, the Officers found clear plastic baggies, some of them containing a white powdery substance. One of the baggies was tested and found to contain methamphetamine. An electronic scale, foil, and a glass tube with burnt residue on it were also in the drawer. A plastic bag found in the drawer held three clear plastic baggies, each containing amphetamine with a combined weight of 10.54 grams.

A search of the garage revealed more methamphetamine. Inside a locked cabinet, the Officers found a plastic container that held several clear plastic baggies with a white powdery substance. The largest bag tested positive for methamphetamine and weighed 24.28 grams. There were nine smaller bags which had a combined weight of 30.22 grams. The substances in two of the smaller bags were tested and found to be methamphetamine. Another container in the cabinet contained plastic tubes with white powdery residue on the ends of the tubes. A second cabinet in the garage, when opened, held U.S. currency and four clear plastic bags, each containing a white powdery substance. Each of the plastic bags weighed more than 3 grams. The substance in two of the plastic bags was tested and found to be methamphetamine. A tool case with Raymond's name on it held tin foil, several clear plastic bags, and a bag of rubber bands. The Officers also found an electronic scale and a Nescafe container on a workbench. Opening the container, the Officers discovered it contained hollow pin tubes with a white powdery substance and other paraphernalia. A small spiral bound notebook held two bags, one containing a white powdery substance and the other containing a powdery residue.

Bennett v. State, No. 20A03-0709-CR-435, slip op. at 2-4 (Ind. Ct. App. May 20, 2008).

On April 22, 2005, the State charged Bennett with possession of methamphetamine weighing three grams or more with intent to deliver as a class A felony. Id. at 4. On May 12, 2005, trial counsel filed an appearance on behalf of Bennett. That same day, the court held a hearing and stated: "Ms. Bennett, you have Mr. Kauffman as your attorney. That sort of ends the controversy on your attorney status conference. Correct?" May 12, 2005 Transcript at 1. Bennett stated: "Correct." Id.

3

On July 21, 2005, the court held another hearing, and Bennett's trial counsel stated:

> Your Honor, this would be the same record made with Mr. Bennett's case. This was acceptance of plea. Anessa's informed me that she would like to go to trial. I would note for the record that I've talked to the Bennetts both and expressed to them the possibility of conflict by representing both of them, and they both have agreed that I would continue as their counsel in this matter in all four, if you would just total them up, the four cases that the Bennetts have together.

July 21, 2005 Transcript at 2. The court then clarified with Bennett that she was not pleading guilty and scheduled a trial.

After multiple hearings, the court eventually held a jury trial on July 16 and 17, 2007. Prior to *voir dire*, the court stated: "This is a joint trial. By agreement, we've had this discussion on at least a couple of occasions, Mr. and Mrs. Bennett, you have one lawyer representing both of you. That is by choice. Is that correct, ma'am?" Trial Transcript at 2-3. Bennett stated: "Yes, your Honor." Id. at 3. The court stated: "And it's also my understanding that you signed a waiver with your lawyer relating to the potential of a conflict of interest with respect to dual representation. Is that correct?" Id. Bennett answered: "Yes." Id. The court asked Bennett's trial counsel whether the defense "to be employed is that not contesting there were drugs at the residence, but they were not these two defendants' drugs," and trial counsel stated: "Yes." Id. at 4.

At trial, during direct examination, Brown testified that he had known Bennett for thirteen or fourteen years, that he met Raymond about a year before he was arrested, and that he was arrested on December 13, 2004. Brown also testified regarding his involvement with methamphetamine and his statements to police.

4

During cross-examination, Bennett's trial counsel asked Brown if he knew how much to sell two bags of methamphetamine for, and Brown answered: "Well, I've sold meth before. I've sold reefer before through my years." Id. at 225. Brown testified that he had been using methamphetamine prior to house sitting and had been up for several days, but did not remember when he started his binge. Brown also testified that he remembered telling Lieutenant Turner that he did not deal methamphetamine and that the statement was probably not true at the time. Brown testified that he was charged with dealing methamphetamine as a class A felony but ended up being convicted of dealing methamphetamine as a class B felony.

Bennett testified that her children were not supposed to be in the home when she was on vacation and that Jolene and Jody were supposed to take care of the children. Bennett also testified that the purpose of the surveillance camera was because one of their vehicles had been struck by an egg and someone stated that her son was involved.

The court instructed the jury on constructive possession, listed certain circumstances, and stated: "In each of these circumstances, there exists the probability that the presence and character of the controlled substances was noticed by the defendants." Id. at 390. The jury found Bennett guilty as charged. Bennett, slip op. at 4.

On August 9, 2007, the court held a sentencing hearing. Bennett's trial counsel argued that mitigators included the facts that Bennett had minor children, this was Bennett's first felony conviction in the State of Indiana, and that she had successfully completed probation in the past. Bennett stated that she was court ordered "to addictions for my DUI that I had for alcoholism." August 9, 2007 Transcript at 21. The court asked

5

Bennett if there was "an addiction issue involving methamphetamine and [her] or any other illegal drugs," and Bennett said: "No." Id. at 22. The court identified certain aggravators and stated that "[t]he statements of counsel and the statements of Ms. Bennett will be considered mitigating circumstances." Id. at 25.

That same day, the court entered an order which stated:

> After hearing the arguments of counsel the Court finds aggravating circumstances to be as follows: Defendant's five (5) prior misdemeanor convictions; the fact that there were minor children present at the home when these offenses were committed, which minor children were in the care and custody of [Bennett and Raymond]. The Court notes [Bennett] has two (2) subsequent cases and the Court considers this to be an aggravating circumstance in addition to those previously mentioned. The Court notes that [Bennett's] five (5) misdemeanor cases basically resulted in probation which proved to be unsuccessful as a result of this conviction and the Court notes that [Bennett] apparently will not or cannot abide by Court orders. The Court also notes as an extreme aggravator [Bennett's] selection of a babysitter was a known drug user to take care of her children while she went on a cruise.

Petitioner's Exhibit 1 at 10-11. The court also noted that the "mitigating circumstances to be all of those factors raised by counsel for [Bennett] at the sentencing argument." Id. at 11. The court weighed the aggravating and mitigating circumstances and noted that "the aggravating circumstances taken together or any one taken individually substantially outweigh the mitigating circumstances warranting the imposition of a five (5) year enhanced sentence." Id. The court ordered Bennett to serve a sentence of thirty-five years with two years suspended. Id. at 11-12.

On direct appeal, Bennett argued that the State failed to prove that she knowingly possessed the methamphetamine and that she intended to deliver it, that the trial court abused its discretion in sentencing her, and that her sentence was inappropriate. Bennett,

slip op. at 5, 9-11. Bennett also stated in her brief that "[t]he court in Combs v. State[, 851 N.E.2d 1053 (Ind. Ct. App. 2006), trans. denied,] states that []when considering whether a D's sentence is inappropriate pursuant to Indiana Appellate Rule 7(B), the appellate ct. should not consider factors which violate Blakely v. Washington, 124 S. Ct. 2531 (2004)." Petitioner's Exhibit 2 at 20.

This court affirmed. Bennett, slip op. at 13. With respect to Bennett's citation of Combs and argument that analysis under Appellate Rule 7(B) should not include factors which violate Blakely, this court found the dissent in Combs to be more pertinent. Id. at 12. This court held that "[t]he dissent clearly establishes that a 7(B) review 'is more expansive and may consider more than simply a "re-look" at the appropriate aggravators and mitigators.'" Id. (quoting Combs, 851 N.E.2d at 1064 (Vaidik, J., dissenting)). The court also held that as Article VII, Section 6 of the Indiana Constitution authorizes independent appellate review, our review under 7(B) is not constrained by using only Blakely aggravators. Id. (citing Combs, 851 N.E.2d at 1065 (Vaidik, J., dissenting)). In analyzing whether Bennett's sentence was inappropriate, the court observed that "we were struck by the enormous amount of methamphetamine found in the Bennetts' residence" and that the "ledgers and notes found in the residence indicate that she was dealing methamphetamine out of a home where minor children were present." Id. at 12. The court also observed Bennett's "minor criminal history consisting of four misdemeanor convictions," the fact that some contraband was left out in the open in a residence where minor children lived, and that Bennett left her children at home under the supervision of another drug abuser. Id. at 12-13.

7

On April 29, 2009, Bennett filed a petition for post-conviction relief alleging that she received ineffective assistance of trial counsel and appellate counsel and that she is entitled to a new trial based upon new evidence. On June 3, 2009, counsel for Bennett filed an appearance. On December 21, 2009, March 29, 2010, October 19, 2011, and April 3, 2012, Bennett filed amended petitions for post-conviction relief. The court held evidentiary hearings on December 15, 2011, November 1, 2012, and January 3, 2013. On June 17, 2013, the court denied Bennett's petition for post-conviction relief.

DISCUSSION

Before discussing Bennett's allegations of error, we note the general standard under which we review a post-conviction court's denial of a petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. Fisher v. State, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. Fisher, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. Id. Further, the post-conviction court in this case entered findings of fact and conclusions thereon in accordance with Indiana Post-Conviction Rule 1(6). "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." Id. In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to

8

conclusions of law. Id. The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. Id.

I.

The first issue is whether Bennett's trial counsel and appellate counsel were ineffective. Generally, to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. French v. State, 778 N.E.2d 816, 824 (Ind. 2002) (citing Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), reh'g denied). We apply the same standard of review to claims of ineffective assistance of appellate counsel as we apply to claims of ineffective assistance of trial counsel. Williams v. State, 724 N.E.2d 1070, 1078 (Ind. 2000), reh'g denied, cert. denied, 531 U.S. 1128, 121 S. Ct. 886 (2001). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. French, 778 N.E.2d at 824. To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Perez v. State, 748 N.E.2d 853, 854 (Ind. 2001). "[L]ogic dictates that 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" Hilliard v. State, 609 N.E.2d 1167, 1169-1170 (Ind. Ct. App. 1993) (quoting Strickland, 466 U.S. at 696, 104 S. Ct. at 2069)). Failure to satisfy either prong will cause the claim to fail. French, 778 N.E.2d at

824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. Id. "When an ineffective assistance of counsel claim is based on the trial counsel's failure to make an objection, the [petitioner] must show that a proper objection would have been sustained by the trial court." Lambert v. State, 743 N.E.2d 719, 732 (Ind. 2001), reh'g denied, cert. denied, 534 U.S. 1136, 122 S. Ct. 1082 (2002).

When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Morgan v. State, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." Williams v. State, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. Clark v. State, 668 N.E.2d 1206, 1211 (Ind. 1996), reh'g denied, cert. denied, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." Burr v. State, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." Whitener v. State, 696 N.E.2d 40, 42 (Ind. 1998).

To the extent Bennett alleges ineffective assistance of appellate counsel, we observe that "[a]s for appellate counsel, ineffective assistance claims 'generally fall into three basic categories: (1) denial of access to an appeal, (2) waiver of issues, and (3) failure to present issues well.'" Garrett v. State, 992 N.E.2d 710, 724 (Ind. 2013)

(quoting Reed v. State, 856 N.E.2d 1189, 1195 (Ind. 2006)). "To show that counsel was ineffective for failing to raise an issue on appeal thus resulting in waiver for collateral review, 'the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential.'" Id. (quoting Ben-Yisrayl v. State, 738 N.E.2d 253, 260-261 (Ind. 2000), reh'g denied, cert. denied, 534 U.S. 1164, 122 S. Ct. 1178 (2002)). "To evaluate the performance prong when counsel waived issues upon appeal, we apply the following test: (1) whether the unraised issues are significant and obvious from the face of the record and (2) whether the unraised issues are 'clearly stronger' than the raised issues." Id. (quoting Timberlake v. State, 753 N.E.2d 591, 605-606 (Ind. 2001), reh'g denied, cert. denied, 537 U.S. 839, 123 S. Ct. 162 (2002)). "If the analysis under this test demonstrates deficient performance, then we evaluate the prejudice prong which requires an examination of whether 'the issues which . . . appellate counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial.'" Id. (quoting Bieghler v. State, 690 N.E.2d 188, 194 (Ind. 1997), reh'g denied, cert. denied, 525 U.S. 1021, 119 S. Ct. 550 (1998)).

Bennett argues that: (A) her trial counsel was ineffective based upon his conflict of interest in representing both her and Raymond; (B) her trial counsel failed to conduct a reasonable investigation and present evidence; (C) her trial counsel and appellate counsel were ineffective for failing to challenge the court's constructive possession instruction; and (D) her appellate counsel was ineffective for not appealing the court's inadequate sentencing statement and not seeking transfer based upon Blakely.

11

A.    Conflict of Interest

Bennett argues that her trial counsel was ineffective based upon his conflict of interest in representing both her and Raymond.  She argues that the post-conviction court's ruling misstates that she and Raymond were addressed about being represented by one attorney on March 30, 2006, and July 5, 2007 as statements on those days were limited to there being a joint trial.  She contends that trial counsel's options in defending her were limited by the risk of increased exposure to Raymond and that trial counsel could have introduced evidence that Brown was working for Raymond.  She also alleges "in light of the undisputed presence of drugs, it was essential that [her] advocate seek an instruction authorizing the jury to convict her of a lesser included offense" of possession of methamphetamine for the methamphetamine weighing less than three grams found in the bedroom.  Appellant's Brief at 39.

The State argues that trial counsel discussed with Bennett and Raymond what could happen if they had separate trials or had a joint trial and that Bennett and Raymond signed a document in which they agreed to waive a conflict of interest.  The State contends Bennett's "waiver of conflict-free representation 'should be presumed valid, and the burden in postconviction proceedings is on the defendant to prove otherwise.'" Appellee's Brief at 26 (quoting Latta v. State, 743 N.E.2d 1121, 1131 (Ind. 2001)).  The State asserts that even assuming that her waiver was not valid, Bennett failed to show that an actual conflict of interest adversely affected her lawyer's performance.  The State posits that the strategy for each defendant was consistent with the other and tended to bolster the other and there was no conflict in their defenses.  The State also contends that

the lack of a request for a lesser-included instruction was not because of counsel's representation of both Bennett and Raymond but was a matter of trial strategy.

The post-conviction court's order states:

28. In the instant case, [trial counsel] testified at the post conviction hearing. He informed the court that he was admitted to the Indiana Bar in 2000 and worked as a private criminal defense attorney and a public defender until 2008. [Trial counsel] stated that he has tried multiple jury trials, including A and B felony drug trials. With respect to [Bennett's] contention that [trial counsel] was ineffective for representing both she and her husband, the record reflects numerous occasions when the court asked [Bennett], Raymond, and [trial counsel] whether the parties wished to be represented by the same attorney and have a joint trial. On July 21, 2005, [trial counsel] told the court, "I talked to the Bennetts both and expressed to them the possibility of conflict by representing both of them, and they both agreed that I would continue as their counsel in this matter in all four, if you would just total them up, the four cases that the Bennetts have together." The court followed up with a confirmation that both parties were satisfied having their trials together. Further confirmation by the court of [Bennett's] desire to have a joint trial with one counsel was had on March 30, 2006, January 11, 2007, and July 5, 2007. Finally, on the first day of trial, another record was made by the court regarding the joint representation and both [Bennett] and Raymond indicated that was the way they wanted it and that they had signed a waiver with [trial counsel] on the issue. Additionally, [trial counsel] testified at the post conviction hearing that he has represented husband and wife clients before and the strategy he had for the Bennett defense included a unified front. His strategy from the outset was to present the same defense for both clients. The defense of each was consistent with and intended to bolster the other. In other words, there was no conflict in the two theories. [Trial counsel] also stated that he advised [Bennett] and Raymond that there was a potential conflict of interest, and that he believed both [Bennett] and Raymond signed a document stating that they waived any conflict. Evidence exists that a plea offer was made to both [Bennett] and Raymond and was conveyed to them by [trial counsel]. It was within the right of the accused to accept or not accept a plea agreement. In sum, [Bennett] was clear that she wanted a joint trial.

\* \* \* \* \*

13

34. . . . [Trial counsel] testified that his strategy was to focus attention on Brown and that police were only at the Bennett house because they were investigating him. He did not want to shift the focus to [Bennett] or Raymond. Therefore, [trial counsel] said that he did not want to argue for a lesser included offense because it would impact his strategy and jeopardize his defense that the drugs belonged to Brown. [Trial counsel] stated that he made a strategic decision not to ask for a lesser included offense instruction for [Bennett] based on the defense presented.

Appellant's Appendix at 314-315, 318-319.

Ind. Rule of Professional Conduct 1.7 addresses conflict of interest and provides:

(a)     Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1)     the representation of one client will be directly adverse to another client; or

(2)     there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b)     Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)     the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)     the representation is not prohibited by law;

(3)     the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4)     each affected client gives informed consent, confirmed in writing.

The federal constitutional right to effective assistance of counsel necessarily includes representation that is free from conflicts of interest. Woods v. State, 701 N.E.2d 1208, 1223 (Ind. 1998), reh'g denied, cert. denied, 528 U.S. 861, 120 S. Ct. 150 (1999). The Sixth Amendment right to counsel encompasses a right to counsel of one's choice. Latta, 743 N.E.2d at 1127 (citing Powell v. Alabama, 287 U.S. 45, 53, 53 S. Ct. 55 (1932)). Thus, joint representation is not a per se violation of the constitutional guarantee of effective assistance of counsel. Id. Under some circumstances, a defendant may properly waive the right to conflict-free representation. Id. (citing Ward v. State, 447 N.E.2d 1169, 1170-1171 (Ind. Ct. App. 1983) (citing Holloway v. Arkansas, 435 U.S. 475, 483 n.5, 98 S. Ct. 1173 (1978))). A defendant may benefit from joint representation as a common defense often gives strength against a common attack. Id.

A defendant's waiver of conflict-free representation should be presumed valid, and the burden in post-conviction proceedings is on the defendant to prove otherwise. Id. at 1131. If there is evidence supporting the conclusion of an uninformed, or worse, improperly influenced waiver, the post-conviction court must assess the defendant's appreciation of the risks. Id. If knowing and voluntary, the waiver is at least entitled to a very strong presumption of validity, and may be conclusive, because it invokes her right to counsel of her choice. Id. "If the waiver does not preclude a subsequent claim of ineffective assistance, there remains the issue, as Cuyler put it, of whether 'an actual conflict of interest adversely affected [the] lawyer's performance.'" Id. (quoting Cuyler v. Sullivan, 446 U.S. 335, 348-349, 100 S. Ct. 1708 (1980)). If so, prejudice under Strickland is presumed. Id.

Trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. Cuyler, 446 U.S. at 347, 100 S. Ct. at 1717. An attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial. Id. Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry. Id. The Indiana Supreme Court has cautioned trial courts that it is prudent at least to inquire in greater detail as to the defendant's understanding of potential areas of conflict and the risk that defenses may not be fully aligned and that evidence exculpatory of one may be inculpatory of another. Latta, 743 N.E.2d at 1131.

We must determine whether Bennett's consent waived any claim of ineffective assistance. See id. at 1132. If it did, Bennett cannot complain about the consequences of her election to proceed with joint counsel. See id. If the waiver was defective, she has her claim of ineffective assistance and it is properly asserted in post-conviction proceedings. Id. Cuyler expressly sets forth the standard to follow where an ineffectiveness claim is based on counsel's conflict of interest. Id. Because it involves balancing the conflicting Sixth Amendment interests, the merits of the claim may depend on the circumstances leading up to the defendant's consent to joint representation. Id.

The Court in Cuyler held that a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance in order to establish a violation of the Sixth Amendment. Cuyler, 446 U.S. at 348, 100 S. Ct. at 1718. A defendant who shows that a conflict of interest actually

16

affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. Id. at 349-350, 100 S. Ct. at 1719. Until a defendant shows that his counsel actively represented conflicting interests, she has not established the constitutional predicate for her claim of ineffective assistance. Id. at 350, 100 S. Ct. at 1719. The possibility of conflict is insufficient to impugn a criminal conviction. Id. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected her lawyer's performance. Id.

We acknowledge Bennett and Raymond had a joint trial which is a circumstance that does not reduce the potential for a divergence in their interests. Cf. id. at 347, 100 S. Ct. at 1718 (observing that the provision of separate trials for the defendant and his codefendants significantly reduced the potential for a divergence in their interests). However, Bennett does not point to the record to suggest that she or Raymond ever objected to the multiple representation. While Bennett's counsel waived opening remarks, prior to *voir dire*, the court asked Bennett's counsel whether the defense "to be employed is that not contesting there were drugs at the residence, but they were not these two defendants' drugs," and trial counsel stated: "Yes." Trial Transcript at 4. Thus, trial counsel's strategy was compatible with the view that neither Bennett nor Raymond were connected with the drugs. These factors suggest that the court did not have a duty to inquire further and favor a conclusion that Bennett consented to joint representation.

Moreover, the record also reveals that the subject of a possible conflict of interest was addressed with Bennett. On July 21, 2005, Bennett's counsel stated that he talked to Bennett and Raymond, expressed to them the possibility of conflict by representing both

17

of them, and that they both agreed that he would continue as their counsel. At the March 30, 2006 hearing, the court asked Bennett if she understood that "the trial will be jointly with" Raymond, and Bennett stated that she understood. March 30, 2006 Transcript at 2. On January 11, 2007, the court held a hearing, addressed Bennett and Raymond, and stated: "You are both here together. These cases were set for trial jointly at the agreement of all counsel and the Court. The Court has talked to you about representation by one defendant [sic]. My recollection is both of you are okay with one lawyer representing you. Is that correct, ma'am?" January 11, 2007 Transcript at 6. Bennett and Raymond both stated that was correct. Id.

> The record contains a copy of a document that states:
>
> We Anessa and Ray Bennett waive any conflict that may arise during the representation of both Anessa and Ray Bennett involving criminal charges pending in Elkhart Circuit Courts, Gregory P. Kauffman, our attorney has informed us of the potential conflict and we understand and fully waive him of any liability or responsibility with regard to any conflict of interest.

State's Exhibit B. While the document in the record is not signed, trial counsel testified that he had given his file to Raymond upon his request and that the document was signed. When asked whether the document would have been presented to Bennett and Raymond, trial counsel stated: "I most certainly would have submitted something to them just say, hey, this is potentially a conflict. We need to have this fixed before we can go forward as a – as a group." Post-Conviction Transcript at 111-112.

At the post-conviction hearing, Bennett's trial counsel testified that his thought was that representing them both together was not the best idea. When asked what he said

18

to Bennett and Raymond when he talked about the conflict of interest, trial counsel stated:

> Well, this wasn't the first time in my career that I'd had a husband and wife or boyfriend and girlfriend get accused of something. So I discussed with them what could happen if they went separately, or what could happen if they attacked this thing together. Because I did that in the two or three other occasions. Just kind of fact pattern approach (indiscernible) came up.

Id. at 98-99.

Trial counsel testified that he relayed an offer that Bennett could plead guilty to a lesser felony and receive four years work release.[2] During direct examination of trial counsel, the following exchange occurred:

> Q    Okay. When the offer to [Bennett] came through, do you remember revisiting the issue of conflict with her at all?
>
> A    I don't remember specifically whether I did or didn't.
>
> Q    Would you – did that change anything for you?
>
> A    I don't know what you mean by that.
>
> Q    Do you recall at that point that it had gone from being a potential conflict to a actual conflict?
>
> A    Yeah, I mean.

Id. at 102. Trial counsel testified that he spoke with Bennett separately and that "it was kind of a decision for the both of them to continue." Id. at 103. He also testified:

> [T]he one thing I remember from when these were discussed is the – the result of the discussion was we're going to go to trial; and it wasn't one party's decision, if I remember correctly. Because at that point in time I would have most definitely said there's a conflict. I can't keep doing this.

---

[2] When asked whether there was an offer made by the State, trial counsel testified that "there was a plea for each of them, yes." Post-Conviction Transcript at 99. Trial counsel later stated that he did not have specific recollection of a conversation either in person or on the phone with somebody making an offer.

Id. at 104.

Under these circumstances, we conclude that Bennett's waiver was knowing and voluntary and precludes her claim of ineffective assistance on this basis.

With respect to Bennett's argument regarding counsel's failure to provide a lesser included instruction as indicating a conflict of interest, we observe that trial counsel testified during direct examination that he did not consider the possibility of tendering a lesser included instruction in Bennett's case. On cross-examination, trial counsel was asked regarding a possible lesser included instruction for Bennett, and the following exchange occurred:

> Q    Would you agree that that would put you in a bit of a trick bag in that you'd be arguing first off that all the drugs were Joe Brown's; but in the alternative, you'd be arguing that if the jury thought the drugs in the bedroom were Ms. Bennett's, hey, they weren't over 3 grams? Would that make you argue in an alternative?
>
> A    Yes.

Id. at 123. We cannot say that counsel's overall strategy regarding ownership of the drugs, or that he might have made alternative arguments warrant reversal.

B.    Reasonable Investigation and Presentation of Evidence

1.    Brown and Mingucha

Under the heading "Inadequate cross-examination of Joe Brown," Bennett argues that the jury "did not know that law enforcement had used its knowledge of Brown's prior drug dealing activities to induce Brown's cooperation in the prosecution of the Bennetts, particularly Raymond." Appellant's Brief at 18. Bennett argues that the jury did not know Brown had been rewarded for his incrimination of her and Raymond.

Bennett contends that "[t]he tape of Brown's interrogation and the transcript of his sentencing hearing, both of which counsel could have obtained, provided needed context." Id. at 19. Bennett alleges that the jury was not informed that Brown possessed in his own home more drugs than were found at Bennett's home in the days preceding execution of the warrant for Bennett's residence. Bennett also alleges the confidential source, the interrogation tape, and Brown's paperwork could have been used to show the jury that Brown was an active dealer. Bennett points to an Affidavit for Search Warrant for Brown's residence which alleged that a cooperating source told the affiant that he had been to Brown's residence and had observed Brown in possession of approximately one-quarter pound of methamphetamine.

The post-conviction court found:

30. With respect to [Bennett's] claim that [trial counsel] was ineffective for failing to raise the matter of bias and motive on the part of Joseph Brown to testify against [Bennett], [trial counsel] testified that he took the deposition of Joseph Brown, and during the deposition of Mr. Brown, there was no indication of favored treatment by the State to procure Brown's testimony. [Trial counsel] also testified that in preparation for the deposition of Mr. Brown, he reviewed the Chronological Case Summary from Browns' criminal case and the plea agreement. [Trial counsel] said he did not recall whether he watched the taped interrogation of Brown by Captain Shawn Turner; however, the videotaped interrogation by Detective Shawn Turner shows no offer of preferential treatment in exchange for testimony against [Bennett]. Further, Mr. Brown testified at trial, and on both direct and cross examination during the trial, no such bargain was exposed. [Bennett] has failed to establish that counsel was ineffective in this regard. Brown testified at trial, had given a taped statement to police, and was deposed prior to trial. Jurors had an opportunity to see and hear him on direct and cross examination. Brown's charge and plea agreement were known to the jury and they were able to compare and evaluate his version of events with those of [Bennett] in conjunction with evidence found at the scene. [Trial

21

counsel's] performance with respect to Joseph Brown was not ineffective.

\* \* \* \* \*

34. As to [Bennett's] contention that [trial counsel] was ineffective for failing to pursue the pre-trial identity of CS 04-209 (Mingucha), [trial counsel] testified that he was aware there was a confidential informant, but he did not feel he would have been successful in obtaining that individual's name. [Trial counsel] stated that he knew at the time the confidential source had provided incriminating evidence against Brown; however, [trial counsel] also realized that CS 04-209 could have corroborated that Brown told him who his supplier was and that Brown was taking over the supplier's business at [Bennett's] house while [Bennett] and Raymond were on vacation. The confidential source could also have corroborated items found in [Bennett's] home that could have harmed [Bennett's] case.

Appellant's Appendix at 316-319.

The record reveals that Bennett's trial counsel deposed and cross-examined Brown, and evidence of Brown's involvement with methamphetamine was before the jury. Specifically, Brown testified that when he socialized with Bennett and Raymond they would become high on methamphetamine and when asked whether he or Bennett and Raymond supplied the methamphetamine, Brown answered: "It was – I'd have some, they'd have some. They didn't supply it all the time, no." Trial Transcript at 215-216. Brown testified that he was arrested, charged with dealing methamphetamine, and convicted of that crime. During cross-examination, Bennett's trial counsel asked Brown if he knew how much to sell the two bags of methamphetamine for, and Brown answered: "Well, I've sold meth before. I've sold reefer before through my years." Id. at 225. Brown also testified that he remembered telling Lieutenant Turner that he did not deal methamphetamine and that statement was probably not true at the time. Brown testified

22

that he was charged with dealing methamphetamine as a class A felony but ended up being convicted of dealing methamphetamine as a class B felony. During re-cross examination, Brown testified that he had been arrested for attempted robbery. To the extent that Bennett suggests that his trial counsel should have sought the identity of the cooperating source, we observe that Adam Mingucha testified that he provided information to the Goshen Police Department about Brown, that he purchased methamphetamine from Brown, and that Brown had to go over to Bennett's residence because Brown said that he was housesitting and that "that's where he got his meth from." Post-Conviction Transcript at 162. Under the circumstances, we cannot say that reversal is warranted on this basis.

2. Corroborative Evidence

Bennett argues that her trial counsel was ineffective for failing to present corroborative evidence. Specifically, Bennett points to the testimony of her father, Doy Dowsett, and her mother, Susan French, and argues that her trial counsel failed to present evidence that she and Raymond had sufficient income not to rely upon drug sales for their livelihood. Bennett points to her mother's testimony at the post-conviction hearing that Bennett's handwriting was dissimilar to the handwriting on the ledgers and that she had paid for the cost of Bennett's vacation and the couple's expenses during the cruise. Bennett also appears to argue that trial counsel was ineffective for failing to introduce a report documenting a police investigation into November 2004 reports of neighborhood houses being egged to corroborate her testimony that the surveillance camera was

23

purchased following incidents of neighborhood vandalism and reports that her son was involved.

The post-conviction court found:

31.     [Trial counsel] also cannot be deemed to be ineffective for failing to call particular witnesses to testify about [Bennett's] alleged employment at the time of the search of her home. Discovery provided to [trial counsel] included statements by [Bennett's] daughter that [Bennett] and Raymond were not working. [Bennett's] daughter could have been called by the State to rebut evidence of employment, and [Bennett's] daughter had also made statements to the police about drug use in the house. [Bennett's] son had also informed a counselor at Parkside Elementary School that [Bennett] and Raymond were using and keeping cocaine in the home. [Trial counsel] testified at the post conviction hearing that he knew of [Bennett's] daughter's statement, and did not want her to testify. He also stated that he did not want emphasis on the fact that [Bennett] had left the children with a drug dealer. [Bennett] testified at trial about income accessible to her and Raymond, and it was for the jury to weigh that testimony against evidence to the contrary.

32.     Doy Dowsett, [Bennett's] father testified at the post conviction hearing that he permitted [Bennett] to work for him to earn money for the cruise, but was not aware whether she had another job or not. He also stated that he did not know enough about [Bennett's] circumstances to have testified at trial even if asked. He also said he did not know when the trial was, and would not have came as he "could not deal with it." Accordingly, even if [trial counsel] had seen fit to call Mr. Dowsett as a witness, it is unlikely anything he would have said would have made a difference.

33.     The same is true with respect to Susan French, [Bennett's] mother, who also testified at the post-conviction hearing. Ms. French stated that it would have been extremely difficult for her to come to [Bennett's] trial because she was caring for a brother with severe Alzheimer's. Ms. French testified that she was in regular contact with [Bennett] who was free on bond, that she knew when the trial was, but never initiated any contact with [trial counsel]. Even though Ms. French said that she funded half the cost of the cruise for [Bennett], she presented no receipts, bank or credit card statements, or ticket stubs in support of that testimony. Even if she had testified at trial, the evidence goes to weight. There is also no showing that

24

anything Ms. French might have offered at [Bennett's] sentencing would have resulted in a different sentence. While Ms. French sent a letter to the court on [Bennett's] behalf, the letter was unsigned and, therefore, inconsiderable. For these reasons, [trial counsel] cannot be found ineffective for failing to call the aforementioned witnesses.

Appellant's Appendix at 316-318.

At the post-conviction hearing, Bennett's father testified that Bennett needed spending money for the cruise and that she helped him on a number of jobs before the cruise. On cross-examination, he testified that other than working for him, Bennett was on unemployment and was "between jobs at that time or had been laid off." Post-Conviction Transcript at 193. When asked why he did not come to the trial, he testified that he "couldn't deal with it." Id. at 197. Bennett's mother testified at the post-conviction hearing that she paid for "one of [Bennett] and Ray to go, and then [Bennett] gave me several different payments afterwards to make up the difference for the two to go on a cruise." Id. at 140. She also testified that the handwriting in the ledger was not consistent with her daughter's handwriting. On cross-examination, she testified that she did not bring any receipts that show that she paid for part of the trip and did not bring any samples of Bennett's handwriting. Based upon the record, we cannot say that Bennett was prejudiced by her trial counsel's failure to introduce the testimony of her parents.

With respect to the camera, at the post-conviction hearing, trial counsel testified that he thought that he tried to explain the camera. Trial counsel testified that he did not have any recollection whether he did or did not try to obtain a police report to corroborate the idea that the camera was installed to catch vandals and that "it sounds plausible that [he] would have done that." Post-Conviction Transcript at 82. Further, during the cross-

25

examination of Lieutenant Turner at trial, Bennett's counsel asked Lieutenant Turner whether a reason for having a camera would be to possibly catch somebody doing something to their home, and Lieutenant Turner replied that "if they had a recording system going at the same time and were constantly recording, would say yes; but most of these individuals are not constantly recording." Trial Transcript at 287. Lieutenant Turner testified that he heard from other officers regarding a possible recording device and that he did not believe that Bennett and Raymond were recording. We cannot say that Bennett was prejudiced by her trial counsel's failure to introduce a police report indicating that houses had been egged.

C.    Constructive Possession Instruction

Bennett argues that she was denied the effective assistance of trial and appellate counsel by their failure to challenge the court's instruction on constructive possession. Bennett urges that her trial counsel was ineffective for failing to object to the instruction and that her appellate counsel was ineffective for failing to argue that the instruction resulted in fundamental error.

The court's instruction on constructive possession stated:

> Possession of methamphetamine with intent to deliver may be founded on either actual or constructive possession.
>
> Actual possession of methamphetamine is actual physical possession of the substance.
>
> Alternatively, constructive possession may support a conviction of possession of methamphetamine with intent to deliver if the jury finds that proof of direct possession is absent. The state can show constructive possession by showing that the defendants had both the intent and the capability and − to maintain dominion and control over the controlled

26

substance. Proof that the defendants possessed the methamphetamine on their person is not required.

To prove intent to possess, the state demonstrate [sic] the defendants' knowledge of the presence of the controlled substance. This knowledge may be inferred either from the exclusive dominion and control over the premises containing the controlled substance or, if the control is non-exclusive, from evidence of additional circumstance pointing to the defendants' knowledge of the presence of the controlled substances. When control is non-exclusive, that is, when the controlled substances are found in a premises with another person or persons present, the defendants' knowledge may be inferred from any of the following circumstances: (1) incriminating statements by the defendants; (2) the amount of controlled substances present; (3) the proximity of the defendants to the controlled substances; (4) the fact that the controlled substances were recovered in a place which would have been in the defendants' plain view; and (5) the location of the controlled substances in close proximity to items owned by the defendant. In each of these circumstances, there exists the probability that the presence and character of the controlled substances was noticed by the defendants.

Trial Transcript at 389-390.

Bennett argues that her trial counsel and appellate counsel failed to challenge the instruction on a number of grounds. She argues that the final line of the instruction usurped the jury's role to determine what the evidence meant and that while the instruction "began with an invitation to infer, it's [sic] ending note tipped the scale by conveying an opinion on the weight to be given certain evidence." Appellant's Brief at 27. Bennett asserts that the instruction "went beyond suggesting a conclusion and amounted to a mandatory or at least a rebuttable presumption, alleviating the State of its duty to prove guilt beyond a reasonable doubt or shifting the burden of persuasion to [her] in violation of her Fifth Amendment right to Due Process." Id. Bennett also argues that the instruction was flawed because it mentioned "incriminating statements by the defendants" and this "could have been interpreted by a juror as a judicial opinion that the

27

defendants' trial testimony was incriminating." Id.  She argues that "the 'amount of controlled substances present' is not evidence of knowledge as stated by the court, even during a sufficiency review, but rather intent to deal," and that "the proximity of the defendants to the controlled substances . . . was not established by the evidence" and its inclusion was unsupported and confusing. Id. at 28.  Next, Bennett argues that "'*the fact that the controlled substances were recovered in a place which would have been in the defendants' plain view*' (emphasis added), by its very language suggests a predetermination that the controlled substances were found in such a place." Id.  She asserts that "plain view" does not apply where the defendant is not present and should not have been suggested to the jury as evidence of possession. Id. (citing Gee v. State, 810 N.E.2d 338, 343 (Ind. 2004)).  Bennett also contends that "the location of the controlled substances in close proximity to items owned by the defendant, is a proper factor to be considered by a court reviewing a sufficiency claim but the jury has no role in determining sufficiency." Id.  She concedes that "[b]ecause trial counsel did not preserve the error, appellate counsel would have had to frame the issue as fundamental error such that a fair trial was impossible." Id. at 24.

Bennett also argues that other instructions exacerbated the harm, and points to the court's statements that "[i]f you find conflicting testimony, you must determine which of the witnesses you will believe and which of them you will disbelieve" and "[i]f you find that any witness has willfully testified falsely concerning any material fact, you have the right to wholly disregard the testimony of such witness, except insofar as it may be corroborated by other credible witnesses, or facts and circumstances credible in

28

themselves." Trial Transcript at 387-388, 392-394. Bennett argues that these instructions are contrary to the holding in Gantt v. State, 825 N.E.2d 874 (Ind. Ct. App. 2005).

The State contends that Bennett's petition for post-conviction relief highlighted the final sentence of the court's constructive possession instruction, and that Bennett's additional claims regarding the instruction and other instructions are waived. The State further contends that the court's constructive possession instruction did not create a mandatory presumption of guilt, and that assuming the instruction was erroneous, it was harmless because Bennett's conviction was clearly sustained by the evidence and the jury could not have properly found otherwise, and because her defense was that she did not know anything about the methamphetamine found in her home thus making the constructive possession instruction irrelevant.

In her reply brief, Bennett argues that she did not waive her claims and points to her amended petition which states that the instruction "unnecessarily emphasizes one phase of the case, . . . expressly authorizes an inference of guilt," and "amounts to a mandatory presumption and is an inappropriate use of a sufficiency standard from case law to direct the jury as to how to weigh the evidence." Appellant's Appendix at 49-50.

The post-conviction court's order states:

36.     Finally, [Bennett's] trial counsel testified that he did not recall objecting to the constructive possession jury instruction, that he had reviewed the instruction, and he did not find anything out of the ordinary about the constructive possession instruction given by the court. The court began its recitation of both preliminary and final instructions with the admonition.

CONSIDER ALL INSTRUCTIONS

> "You are to consider all the instructions that are given to you as a whole and you are to regard each with the others given to you. Do not single out any certain instruction, sentence, or any individual point and ignore others."

> Both preliminary and final instructions were provided in writing to each juror.

37. The constructive possession instruction given in this case is a fair and accurate statement of the law. Goffinet v. State, 775 N.E.2d 1227 (Ind. Ct. App. 2002)[, trans. denied].

38. Not only has there been no showing that [trial counsel's] representation fell below an objective standard of reasonableness as determined by prevailing professional norms, [Bennett] has failed to establish that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. There was significant evidence both testimonial and tangible presented at trial to support [Bennett's] conviction. Methamphetamine and amphetamine were found in the locked bedroom along with scales, multiple baggies and a detailed ledger. An item described as a "cutting" agent for methamphetamine was found under the bed. No key was found to the room and police had to break down the door. Domain documents were found in the bedroom. Paraphernalia for the ingestion of methamphetamine was also found inside the locked room. The garage contained an even greater array of drugs and indicia of drug dealing including aluminum foil attached to the wall, compartments for secreting drugs and money, a surveillance camera in the attic, and the working television monitor. No prejudice has resulted from anything [Bennett] asserts [trial counsel] should have done that he did not do. The court concludes that trial counsel absolutely was not ineffective in his representation of [Bennett].

Id. at 319-320.

As to waiver, Bennett's amended petition stated that trial counsel failed to object to the court's constructive possession instruction, provided a portion of the constructive possession instruction, and italicized the following statement: "*In each of these*

30

*circumstances, there exists the probability that the presence and character of the controlled substances was noticed by the defendants.*"  Id. at 49.  Bennett alleged:

> The instruction unnecessarily emphasizes one phase of the case, and expressly authorizes an inference of guilt.  "An instruction as to what evidence warrants an inference of guilt clearly invades the jury's province . . . ."  *Crawford v. State*, 550 N.E.2d 759, 761, (Ind. 1990) quoting (*Sanson v. State*, 267 Ind. 33, 366 N.E.2d 1171, 1173-1174 (1977).  The instruction amounts to a mandatory presumption and is an inappropriate use of a sufficiency standard from case law to direct the jury as to how to weigh the evidence.

Id. at 49-50.  Bennett's amended petition also stated:

> The trial court's instruction on constructive possession invaded the province of the jury to weigh the evidence in determining whether the State proved its case beyond a reasonable doubt on the issue of intent to possess.  The trial court's error was apparent on the face of the record and critical to an evaluation of the validity of the conviction, especially in light of the issues raised by appellate counsel.  Appellate counsel should have raised the issue of how the jury was instructed to decide the question of intent to possess instead of sufficiency of the evidence, given the facts of the case.

Id. at 51-52.

To the extent that Bennett challenges the court's other instructions, we find those arguments waived because Bennett's amended petition challenged only the instruction on constructive possession.  See Allen v. State, 749 N.E.2d 1158, 1171 (Ind. 2001) ("Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal."), reh'g denied, cert. denied, 535 U.S. 1061, 122 S. Ct. 1925 (2002); Post-Conviction Rule 1(8) ("All grounds for relief available to a petitioner under this rule must be raised in his original petition.").

Even assuming that the trial court improperly listed certain factors and erred in instructing the jury that there existed the probability that the presence and character of the

controlled substances was noticed by the defendants in each of the circumstances, we cannot say that reversal is warranted. The court instructed the jury to consider all the instructions as a whole, and to not single out any certain instruction, sentence, or any individual point. The court instructed the jury on the elements of the offense, defined the term "knowingly," told the jury that Bennett should be found not guilty if the State failed to prove each of the elements beyond a reasonable doubt, that Bennett was not required to present any evidence to prove her innocence or to prove or explain anything, and instructed that the jury was the exclusive judge of the weight of the evidence and the credibility of the witnesses. The court stated: "You must consider all of the evidence as a whole and must not single out any particular fact or circumstance." Trial Transcript at 394. The court also instructed: "Your verdict should be based only on the evidence admitted and the instructions on the law. Nothing that I say or do is intended to recommend what facts or what verdict you should find." Id. at 396. The court again informed the jury: "You are the sole judges of the credibility of all witnesses and the weight and effect of all evidence." Id. at 398-399. Under the circumstances, including the additional instructions and the strength of the evidence, we cannot say that Bennett was prejudiced by her trial counsel's failure to object or her appellate counsel's failure to argue fundamental error.

D.     Sentencing Statement

Bennett contends that her appellate counsel was ineffective for: (1) failing to address the inadequacy of the trial court's sentencing statement because the court failed to specifically identify mitigators; and (2) failing to raise trial court error based on the

violation of her Sixth Amendment right to have a jury determine the existence of aggravators not admitted or adjudicated as required by Blakely, and failing to seek transfer despite this court's reliance on the dissenting opinion in Combs. The State argues that the trial court considered Bennett's proposed mitigators, that the fact that this court affirmed the trial court's sentence after considering the Blakely violation shows a Blakely challenge would not have been successful in reducing Bennett's sentence, and that it was clear from the trial court's sentencing order that it would have imposed the same five-year enhancement without regard to the aggravators which Bennett alleges were improper under Blakely.

The post-conviction court found:

19.     On direct appeal, [Bennett] raised the issues of insufficiency of the evidence to establish that she possessed methamphetamine with intent to deliver, that her aggravated sentence violated her rights under Blakely v. Washington, 542 U.S. 296 (2004), and that her sentence was inappropriate in light of the nature of the offense and her character. The Court of Appeals held that there was substantial evidence supporting the jury's guilty verdict. Further, the Court found that even though two of the aggravators cited by the trial court in imposing sentence were invalid under Blakely, the fact of [Bennett's] prior criminal history rendered the sentence valid. Additionally, the Court found that the sentence was appropriate given all the circumstances present in this case.

* * * * *

39.     [Bennett] also claims that [her appellate counsel] was ineffective . . . because he failed to adequately raise a specific Blakely issue, particularly the impact of Blakely upon her sentence . . . . Not only did [appellate counsel] testify at the post conviction hearing that he argued on direct appeal the weighing of aggravators and the relationship of Blakely, [Bennett's] Blakely issue is moot. The Indiana Court of Appeals did review [Bennett's] sentence using the rationale of Blakely. It recognized a Blakely violation and found that only [Bennett's] criminal history qualified as a proper

33

aggravator. In sum, the trial court's statement that a single aggravator justified the enhanced sentence disposed of the unraised Blakely claim in its entirety. The reviewing court went on to thoroughly analyze [Bennett's] sentence in light of several other factors and determined it to be appropriate. It is well established that the post conviction process allows a petitioner to raise challenges that were not known at the time of the original trial or available at the time of the direct appeal. Ben-Yisrayl v. State, 738 N.E.2d 253, 258 (Ind. 2000). Issues that were known and available but not raised on direct appeal are waived and, thus are unavailable for post conviction review. Id. Issues that were raised and determined on direct appeal are *res judicata* and also are not available for further review in post conviction proceedings. Timberlake, *supra*, 753 N.E.2d at 597. There was no obligation for [appellate counsel] to seek transfer of the unanimous and well explained decision of the Indiana Court of Appeals.

Appellant's Appendix at 311-312, 320-321.

1. Specifically Identified Mitigators

To the extent Bennett argues that her appellate counsel was ineffective for failing to address the inadequacy of the trial court's sentencing statement because the court failed to specifically identify the mitigators, we disagree. In Mayes v. State, the defendant argued that the trial court failed to identify any mitigating factors. 744 N.E.2d 390, 395 (Ind. 2001). The Indiana Supreme Court held that while the trial court did not specifically outline the mitigating factors applied it recognized their existence and alluded to factors defense counsel offered for consideration. Id. The Court also observed that there were mitigating factors but the aggravators outweighed the mitigators. Id. The Court also stated that although the trial court's sentencing statement was not a model of clarity, it was clear that the trial court engaged in an evaluative process and properly considered significant mitigators. Id.

34

In the present case, similar to Mayes, the trial court's order stated that the "mitigating circumstances to be all of those factors raised by counsel for [Bennett] at the sentencing argument." Petitioner's Exhibit 1 at 11. The order also indicated that the court weighed the aggravating and mitigating circumstances and found that the aggravating circumstances outweighed the mitigating circumstances. While the court did not specifically identify the mitigating factors, the court recognized their existence and alluded to factors presented by Bennett and her counsel. Id. We cannot say that reversal is warranted on this basis.

    2.    *Blakely* / Request for Transfer

With respect to Bennett's argument that appellate counsel failed to raise trial court error based on the violation of her Sixth Amendment right to have a jury determine the existence of aggravators not admitted or adjudicated as required by Blakely, we observe that Bennett's appellate counsel cited Combs and argued that factors which violate Blakely should not be considered when considering whether a defendant's sentence is inappropriate pursuant to Ind. Appellate Rule 7(B). Thus, appellate counsel raised the Blakely issue at least to some extent.

To the extent Bennett argues that her appellate counsel did not sufficiently develop an argument under Blakely or failed to seek transfer despite this court's reliance on the dissenting opinion in Combs, we observe that the trial court's order stated that "the aggravating circumstances taken together or any one taken individually substantially outweigh the mitigating circumstances warranting the imposition of a five (5) year enhanced sentence." Petitioner's Exhibit 1 at 11. Bennett's criminal history is a valid

aggravator under <u>Blakely</u>. The presentence investigation report ("PSI") indicates that Bennett had prior convictions for illegal consumption of an alcoholic beverage as a misdemeanor in 1994, operating under the influence with an occupant less than sixteen years old as a misdemeanor in 2000, and operating with a BAC .10% or above as a class C misdemeanor in 2002. The PSI also reveals that Bennett was arrested for operating under the influence as a misdemeanor on October 9, 2005, in Michigan and was later convicted. Bennett also admitted at the sentencing hearing that she had four misdemeanor convictions. We observe that the court enhanced Bennett's thirty-year sentence by only five years and suspended two years, and we cannot say that reversal is warranted.

## II.

The next issue is whether the State withheld evidence from the defense that impeached and incriminated another person in violation of <u>Brady v. Maryland</u>.[3] Bennett argues that her trial counsel was not informed that law enforcement's investigation of Brown included two supervised buys from his home on November 23, 2004, and December 8, 2004, or that police had obtained a warrant to search his home based on their belief he possessed large quantities of drugs there on December 10, 2004. She also appears to argue that the State withheld evidence that Brown received a reduced charge due to his cooperation. Specifically, she argues that "[p]ost-conviction litigation

---

[3] We note that Bennett did not raise a <u>Brady</u> claim on direct appeal. "Issues available to the defendant on direct appeal which are not raised are generally forfeited." <u>Minnick v. State</u>, 698 N.E.2d 745 (Ind. 1998), <u>reh'g</u> denied, <u>cert.</u> denied, 528 U.S. 1006, 120 S. Ct. 501 (1999). Because it is unclear when Bennett became aware of Brown's involvement with methamphetamine and sentence and to the extent that she has intertwined this claim with her ineffective assistance of trial counsel claim for failure to investigate and cross-examine Brown, we will exercise an abundance of caution and address her claim. <u>See</u> <u>McKnight v. State</u>, 1 N.E.3d 193, 206 n.6 (Ind. Ct. App. 2013).

illustrated that the State's reduction of Brown's charge to a B felony and recommendation of a lenient sentence were specifically based in part on his 'cooperat[ion] with the Goshen Police Department upon his arrest and thereafter." Appellant's Brief at 43 (citing "PCR Exh. 50, pp. 3, 5"). She appears to cite to Brown's sentencing hearing in which the prosecutor stated that Brown "did cooperate with the Goshen Police Department upon his arrest and thereafter." Petitioner's Exhibit 50 at 5 of the Sentencing Hearing. She also points to a police interview with Brown in which the police officer states that Brown was being cooperative.

The State argues that Bennett's trial counsel reviewed Brown's statement to Lieutenant Turner and that this is shown by several questions asked by trial counsel during Brown's deposition. The State contends that Lieutenant Turner mentioned the search warrant that Bennett claims the State suppressed in his interview with Brown. Thus, the State argues that "it is clear from Brown's deposition that [Bennett] would have been aware of the search warrant for Brown's house." Appellee's Brief at 30. The State also asserts that it could not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence. In her reply brief, Bennett argues that trial counsel had no recollection of seeing the tape of Lieutenant Turner's interrogation of Brown but learned of its existence sometime during the case.

The post-conviction court's order states:

35. [Trial counsel] was not ineffective for alleging [sic] failing to obtain discovery that was favorable to the defense. There is nothing to indicate that the State suppressed evidence favorable to the defense which was material to an issue at trial. The State provided evidence

through the discovery process that a controlled buy had taken place at [Bennett's] residence at 407 Glenwood Drive, Goshen, Indiana. The discovery provided the confidential source's identifying number, CS 04-209, and that the purchase was from Brown. CS 04-209 was discovered to the defense on its Preliminary Notice to Defendant of Potential Witnesses at Trial and Exhibit List filed on January 30, 2006. The Affidavit for Search Warrant filed on December 17, 2004, and its return are also identified on the Exhibit List. The warrant indicates that CS 04-209 knew an individual (Brown) that lived on Jefferson Street who was selling methamphetamine and cocaine and who had been in possession of methamphetamine. The State did not withhold evidence favorable to the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963).

Appellant's Appendix at 319 (citation omitted).

Under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), the State has an affirmative duty to disclose material evidence favorable to the defendant. State v. Hollin, 970 N.E.2d 147, 153 (Ind. 2012). "To prevail on a Brady claim, a defendant must establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." Id. (quoting Minnick v. State, 698 N.E.2d 745, 755 (Ind. 1998) (citing Brady, 373 U.S. at 87, 83 S. Ct. 1194), reh'g denied, cert. denied, 528 U.S. 1006, 120 S. Ct. 501 (1999)). Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. The State will not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence. Stephenson v. State, 864 N.E.2d 1022, 1057 (Ind. 2007), reh'g denied, cert. denied, 552 U.S. 1314, 128 S. Ct. 1871 (2008).

To the extent that Bennett alleges that the State withheld evidence regarding Brown's involvement with drugs, we observe that during the deposition of Brown by Bennett's trial counsel on February 6, 2006, which occurred more than a year before the trial, trial counsel asked whether Brown remembered meeting Lieutenant Turner, and Brown stated that he remembered that he gave Lieutenant Turner a statement. Trial counsel also discussed Brown's statement to Lieutenant Turner in which Brown admitted to selling methamphetamine or receiving a "ball" and "a teenager a week," which according to Brown was "half of a ball." State's Exhibit C at 12. Trial counsel also questioned Brown regarding the police going to his residence and the fact that the police did not find drugs at his residence.

Further, Bennett does not point to the record to suggest what evidence the State provided her trial counsel. She concedes that her trial counsel received the Affidavit for Search Warrant, Search Warrant and Return on the Warrant prepared in connection with her case.[4] She also does not dispute that those documents disclosed allegations made by a cooperating source about Brown's drug possession and dealing and details about the controlled buy from Brown. We also observe that evidence of Brown's involvement with methamphetamine was before the jury.

With respect to the alleged reduction in Brown's sentence due to his cooperation, we cannot say that the police interview of Brown or the prosecutor's statements at the

---

[4] Bennett cites Post-Conviction Exhibit 54 for this proposition. We note that Bennett's post-conviction counsel stated at one point: "I'm moving to admit Exhibit No. 54, which is the affidavit for search warrant under MC182 which is the search warrant served on the Bennett home." Post-Conviction Transcript at 288. After some discussion, Bennett's counsel stated that he would withdraw Exhibit 54. The court later stated that it needed Exhibit 54 "[b]ecause otherwise we're going to end up with a mysterious Exhibit 54 that doesn't exist, and we'll show that you've withdrawn it." Id. at 291.

sentencing hearing stand for the proposition that the reduction of Brown's charge to a class B felony and recommendation of a lenient sentence were specifically based in part on his cooperation with the Goshen Police Department. Rather, the prosecutor emphasized at the sentencing hearing that Brown pled guilty. Again, under the circumstances, we cannot say that reversal is warranted on this basis.

## CONCLUSION

For the foregoing reasons, we affirm the post-conviction court's denial of Bennett's petition for post-conviction relief.

Affirmed.

VAIDIK, C.J., and NAJAM, J., concur.